UNITED STATES, Appellee,

v.

Kevin A. FRENCH, Airman First Class
U.S. Air Force, Appellant.

No. 93–0534.
CMR No. 29123.

U.S. Court of Military Appeals.

Argued July 14, 1993.

Decided Sept. 30, 1993.

Certiorari Denied Feb. 22, 1994.

See 114 S.Ct. 1056.

For Appellant: *Lieutenant Colonel Frank J. Spinner* (argued); *Colonel Terry J. Woodhouse* (on brief).

For Appellee: *Major John H. Kongable* (argued); *Colonel Richard L. Purdon* and *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

CRAWFORD, Judge:

After denial of defense motions to suppress his confession and evidence derived from a search of his house, appellant entered conditional pleas of guilty to possessing lysergic acid diethylamide (LSD), possessing marijuana, and using marijuana, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Contrary to his pleas, he was found guilty of attempted use of methamphetamine, in violation of Article 80, UCMJ, 10 USC § 880. The convening authority approved the sentence of a bad-conduct discharge, 8 months' confinement, partial forfeitures, and reduction to the lowest enlisted grade. The Court of Military Review affirmed the findings and sentence. 36 MJ 589 (1992). We granted review of the following issues:

## I

WHETHER THE INVOLVEMENT OF AIR FORCE PERSONNEL IN AN INTERVIEW CONDUCTED BY BRITISH AUTHORITIES UNDER THE FACTS OF THIS CASE CONSTITUTED "PARTICIPATION" UNDER MIL.R.EVID. 305(h)(2), TRIGGERING THE REQUIREMENT TO GIVE ARTICLE 31, UCMJ, [10 USC § 831,] and *MIRANDA* RIGHTS' ADVICE.

## II

WHETHER THE INVOLVEMENT OF AIR FORCE PERSONNEL IN A SEARCH CONDUCTED BY BRITISH AUTHORITIES UNDER THE FACTS OF THIS CASE CONSTITUTED "PARTICIPATION" UNDER MIL.R.EVID. 311(c)(1), TRIGGERING THE REQUIREMENT TO COMPLY WITH THE FOURTH AMENDMENT.

We hold that involvement of Air Force personnel did not trigger the requirement to give rights' warnings or to comply with the Fourth Amendment.

## FACTS

An undercover informant who was working with the Air Force Office of Special Investigations (OSI) began working with British law enforcement officials when the sources of information led to British nationals. This investigation by the British police resulted in the arrest of Travis Pelc, the dependent spouse of an active-duty military member, for possessing, using, and supplying controlled drugs. At the time of his arrest Mr. Pelc indicated he had sold LSD and marijuana to appellant and his wife. Based upon this information, British law enforcement officers, Detective Sergeant John Paul Scotney and Detective Constable Newton, accompanied by OSI Special Agent Sterne, briefed appellant's commander and his first sergeant about their desire to arrest French for a drug offense. Accompanied by the first sergeant, they went to appellant's duty station in a restricted area, where appellant was arrested by the British law enforcement officers.

Appellant testified that, after the initial introduction at his workplace, he sat back down in his chair, looked at his first sergeant, and asked for help. Scotney said that this was "all under British law" and that the first sergeant had "nothing to do with" it.

Before interrogating appellant, the British police had already taken appellant's wife into custody and knew that a search was being conducted of their house for drugs. Appellant was warned by the British interrogators that he had a right to remain silent and that anything he said could be used in evidence against him. Appellant initially denied any knowledge of a drug sale by Pelc, drug use, or drugs in his house. Several minutes after the denial, Agent Sterne made a comment to the accused to the effect that it was "better" to remain "quiet than to continue lying." Appellant's first sergeant testified, "Then at one point, I think it was after Mick [Newton] said something to the effect that it'd be easier on him. He looked at me and I kind of nodded that it would be." During his testimony appellant stated that Agent

Sterne told him, "It's better for you to tell the truth than to lie" and admitted that he was never questioned by Agent Sterne or the first sergeant. Appellant remembers the "easier" language, as well as the OSI agent's saying, "It's better for you to tell the truth than to lie, Kevin." Appellant also remembers looking at his first sergeant who nodded his head. After a short delay, appellant proceeded to give an incriminating statement.

After being interrogated at the British Police Station, appellant was released later that evening. Upon his release his first sergeant picked him and his wife up and drove them to their house. Appellant asked the first sergeant "to come in and talk to him and his wife." When the first sergeant went into the house, he read appellant his Article 31(b) rights which appellant waived.

At trial, Detective Sgt. Scotney testified that the investigation was neither Air Force initiated nor "a joint operation" with the U.S. Air Force. He also testified that Agent Sterne and appellant's first sergeant: were there to "assist" as this "was a British investigation"; made no other "remarks or comments" during the interrogation; and were merely "observer[s] helping us." In fact, Detective Scotney testified this was "not a joint operation" and that assistance by the AFOSI was needed to give the British police points of contact and escorts at the base and to tell them where people could be located.

Upon questioning by the judge, Agent Sterne testified as follows:

> You indicated that the British policemen needed to be escorted into Airman French's duty area?
>
> A: Yes, Sir.
>
> Q: Did you also need an escort?
>
> A: Yes, Sir.
>
> Q: And that was Sergeant Keister?
>
> A: Yes, Sir.
>
> Q: You could not just go in there on your own either?
>
> A: I didn't have a restricted area badge for that area. Sir, No, Sir.

> Q: What was your understanding of your reason for being along that day?
>
> A: My understanding was to escort the British policemen, to observe what was going on, and to gather the information that [was] being gathered out of it, if they found drugs, and so forth, because there was a direct Air Force concern, obviously, that he was an Air Force maintenance individual.

The military judge made the following findings of fact:

> One, the Cambridgeshire drug squad was the lead law enforcement agency involved in investigating drug offenses in which the accused became a suspect.
>
> Two, Air Force Office of Special Investigations personnel, Detachment 6204, RAF Alconbury, meet frequently with members of the Cambridgeshire drug squad to share information and coordinate activities. This investigation originated with British nationals and involved more British persons than person in or related to the military. There was a lower level of involvement by military members and those related to military members.
>
> Three, the actual arrest of Travis Pelc on 25 July 1990 and the arrests of the accused and his wife later on 25 July 1990 were made by British police authorities. United States military authorities were present at those arrests primarily as observers of British police authorities and to assist the British police authorities in locating individuals on military installations.
>
> Four, the arrest of Travis Pelc, his being in possession of drugs, and his statement that he had provided LSD and hashish to the accused on 24 July 1990, coupled with previous information about the accused being involved with drugs, provided British police authorities with reasonable suspicion that the accused and his wife would be in possession of drugs on 25 July 1990.
>
> Five, British police authorities, acting on their reasonable suspicion, went with AFOSI personnel to arrest the

accused and his wife. Woman Detective Constable Carole McCready, accompanied by Special Agent Brian Lemelin, arrested Mrs. French at the Shoppette on RAF Upwood. Detective Sergeant John Paul Scotney and Detective Constable Newton, accompanied by Special Agent Sterne, briefed the accused's commander and first sergeant, then went with Special Agent Sterne and the first sergeant to the accused's duty section.

Six, after the first sergeant explained who everyone was, Detective Sergeant Scotney showed his identification and cautioned the accused to the effect that he did not have to say anything unless he wanted to, but that if he did say anything, it could be used as evidence. Detective Sergeant Scotney and Detective Constable Newton then asked questions of the accused concerning the location of drugs at his residence. Special Agent Sterne witnessed the above events and corroborates that the accused was cautioned.

Seven, the accused answered questions put to him by the British police, initially denying knowledge of drugs. After several minutes of denials by the accused, Special Agent Sterne made a comment to the accused to the effect that "It was better to remain quiet than to continue lying." This comment was meant by Special Agent Sterne to warn the accused that the should remain silent, rather than make things worse by lying to the police. The comment was not designed to elicit a response from the accused.

Eight, a comment by the British police, Detective Constable Newton, that "It would be easier," when taken in context and immediately following Special Agent Sterne's comment, does not amount to an unlawful inducement to get the accused to make admissions. I interpret that comment as an agreement by Detective Constable Newton with Special Agent Sterne's comment essentially meaning the accused should not compound his problems by lying. I do not interpret the comment as unlawfully encouraging an admission.

Nine, the accused at that point reflected upon his situation and, I conclude, decided on his own that the British police knew everything already and that discovery of the drugs was inevitable.

Ten, the accused then voluntarily disclosed the location of the LSD and indicated there was hashish in the house also.

Eleven, Woman Detective Constable McCready had by this time taken Mrs. French to the quarters on RAF Upwood. The search warrant issued earlier by a magistrate had an incorrect address on it, so she relied on Section 18 of the Police and Criminal Evidence Act of 1984 as the basis for the search of the residence before Mrs. French was transported to the Huntingdon police station. Mrs. French cooperated and showed WDC McCready where the hashish was. Through an oversight, no inspector has performed the acts specified in subsection (7) of Section 18 of the Police and Criminal Evidence Act of 1984.

Twelve, after the accused disclosed the location of the LSD, Special Agent Sterne radioed the information to his office. The information reached Special Agent Lemelin at the accused's residence; he told WDC McCready. Mrs. French assisted in actually locating the LSD. After the LSD and hashish had been found, an Air Force drug dog and handler walked through the accused's residence at the request of the British police, but nothing was found as a result of that walk-through.

Thirteen, the accused, his office, locker, and car were then searched. Nothing was found. The accused was handcuffed, using Special Agent Sterne's cuffs, for some time, but the cuffs were removed before he was transported to the Huntingdon police station.

Fourteen, at the Huntingdon police station, a custody officer authorized the accused's continuing detention and advised him on procedures, on his right to make a phone call, and on his right to consult with a solicitor. The accused did not make a phone call or ask to consult with a solicitor.

Fifteen, the accused was placed in a cell for about an hour, then brought out and reinterviewed by Detective Sergeant Scotney and WDC McCready. He was cautioned again and answered questions again. The interview was tape recorded and Appellate Exhibit V is a full transcription of the interview.

Sixteen, throughout the arrest and interrogations of the accused and his wife, the British police authorities were in charge of the case and they intended to take jurisdiction of the case.

As the Court of Military Review found:

In this drug probe initiated, controlled, and concluded by British authorities, appellant was just one of several suspects, and the only U.S. military member mentioned. Nothing in the OSI's earlier awareness of this case, the appearance of Air Force personnel at appellant's first interview, the single comment made by the OSI agent during that interview, or the brief use of the OSI's handcuffs in appellant's arrest, reached the level of "participation" necessary to turn the British interrogation of the appellant into a United States interrogation.

36 MJ at 592 (footnote omitted).

### A.   Treaty Agreements

Under the United States treaty agreement with host countries in the North Atlantic Treaty Organization (NATO), the United States retains no jurisdiction over foreign nationals or dependents accompanying the Armed Forces. Under Article VII.2.-(b) of the NATO Treaty,[1] exclusive jurisdiction over dependents rests with the United Kingdom:

The authorities of the receiving State shall have the right to exercise exclusive jurisdiction over members of a force or civilian component and their dependents with respect to offenses, including offenses relating to the security of that State, punishable by its law but not by the law of the sending State.[2]

Moreover, both the United States and the United Kingdom must "assist each other in the arrest of members of a force or civilian component or their dependents in the territory of the receiving State and in handing them over to the authority which is to exercise jurisdiction...." Article VII. 5.-(a).[3]

Here, the investigation was unquestionably a British investigation and not a "joint operation." Detective Scotney testified that Air Force personnel were there to "assist" and that this was not their investigation but "was a British investigation." The arrest of appellant was also not the result of a "joint operation." In fact, the investigation had centered on foreign nationals and dependents over whom the United States had no jurisdiction whatsoever.

### B.   Standard of Review

Based on the deference for factual findings made by the trial judge and the appellate court below, we have applied a clearly erroneous test to these findings. This Court previously indicated in *United States v. Penn*, 18 USCMA 194, 199, 39 CMR 194, 199 (1969):

Where the evidence presents a question of fact as to the continued independence

---

1. Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 4 U.S.T. 1792, 1798, T.I.A.S. No. 2846 (effective date August 23, 1953) (NATO SOFA).

2. Judicial notice may be taken at any stage of the proceeding. *United States v. Bliss*, 642 F.2d 390 (10th Cir.1981); *United States v. Jones*, 580 F.2d 219 (6th Cir.1978). The military courts have taken judicial notice of treaties. *See, e.g., United States v. Stokes*, 12 MJ 229 (CMA 1982). *See generally United States v. Brown*, 18 MJ 360, 361 (CMA 1984).

3. NATO SOFA, 4 U.S.T. at 1800.

of the civilian and military investigations that question is determinable by the court members, under appropriate instructions as to the effect of a failure to comply with Article 31.

This standard was enunciated prior to issuance of paragraph *140a* (2), Manual for Courts–Martial, United States, 1969 (Revised edition), when issues on admissibility of confessions were presented to the court members and there was no option for trial before a military judge alone.

At least one court has defined the clearly-erroneous standard by stating that it must be "more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts and Electric Motors Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir.1988). *See also United States v. Rice*, 995 F.2d 719, 722 (7th Cir.1993). While there are numerous definitions of clearly erroneous, Professors Childress and Davis indicate, "Appellate courts must think long and hard before reversing a district court...." S. Childress & M. Davis, *Federal Standards of Review* § 2.04 at 2–32 to 2–33 (2d ed.1992). Under the facts presented in this case, the findings by the judge and Court of Military Review are not clearly erroneous.

### C. Presence at or Participation in Foreign Police Investigations and Interrogations

The question of whether presence at and participation in foreign police investigations and interrogations of military personnel require satisfaction of Article 31(b) or the Fourth Amendment has had a checkered history before this Court. In *United States v. DeLeo*, 5 USCMA 148, 156, 17 CMR 148, 156 (1954), this Court indicated "that the mere presence of a military investigator during a search by foreign police [does not] necessarily render[ ] the proceeding an activity of the United States." This Court in *United States v. Penn*, 18 USCMA at 199, 39 CMR at 199, stated:

Article 31 extends to the civilian investigator .... (1) [w]hen the scope and char-

acter of the cooperative efforts demonstrate "that the two investigations merged into an indivisible entity"; and (2) when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military."

(Citations omitted.)

In *United States v. Jordan*, 1 MJ 334, 337–38 (CMA 1976), this Court "conclude[d] that the *DeLeo* standard no longer is satisfactory to safeguard the constitutional rights of servicemen stationed in a foreign country." Thus it held

that, for trials by court-martial commencing after the date of this opinion, whenever American officials are present at the scene of a foreign search or, even though not present, provide any information or assistance, directive or request, which sets in motion, aids, or otherwise furthers the objectives of a foreign search, the search must satisfy the Fourth Amendment as applied in the military community before fruits of the search may be admitted into evidence in a trial by court-martial....

*Id.* at 338.

In *United States v. Jones*, 6 MJ 226, 230 (CMA 1979), the Court tempered the dictum in *Jordan* by indicating that "*Jordan* refers to American 'assistance,' [but] the operative language is 'sets in motion, aids, or otherwise furthers the objectives of a foreign search.'" It went on to indicate the key is "an element of causation between the American activity and the production of the incriminating evidence...." It concluded the real question was not the presence of American authorities but whether the American authorities had used the foreign police as an instrumentality of the American authorities in an effort to avoid the requirements of Article 31(b).

In 1980 the President adopted Mil. R.Evid. 305(h)(2), 1969 Manual, *supra* (Change 3), which provided:

An interrogation is not "participated in" by military personnel or their agents or by the officials or agents [of a state or the federal government] merely because

they were present at an interrogation conducted in a foreign nation by officials of a foreign government....

45 Fed.Reg. 16947 (1980). The Drafters' Analysis to this rule citing *Jones* provides: "The Rule makes it clear that United States personnel do not participate in an interrogation merely by being present at the scene of the interrogation." 1969 Manual, *supra* at A18–29 (Change 3); *see* Mil. R.Evid. 305(h)(2) and its Analysis in Manual for Courts–Martial, United States, 1984, at A22–15 (Change 2). It references the analysis to Mil.R.Evid. 311(c) which deals with whether foreign searches should be considered to be American searches and arrests. 1969 Manual, *supra* at A18–33 (Change 3); 1984 Manual, *supra* at A22–17 (Change 2).

In *United States v. Morrison*, 12 MJ 272, 279 (CMA 1982), the Court asserted "that the rule of *Jordan* should no longer be applied." Chief Judge Everett then stated:

> Accordingly, in conformity with Mil. R.Evid. 311(c)(3), we shall no longer hold that in itself presence at a foreign search constitutes participation therein. Instead, in each case the presence of American officials must be examined to determine whether it had the benign purposes hypothesized by *DeLeo* or instead was part of a scheme to evade the Fourth Amendment, as feared by the majority in *Jordan*.

More recently the Court has solidified *Penn* and its progeny in *United States v. Moreno*, 36 MJ 107, 113 (CMA 1992); *United States v. Lonetree*, 35 MJ 396, 403 (CMA 1992), *cert. denied*, — U.S. —, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993).

■ The analysis under *Penn* begins with examining the case from the time of the investigation through interrogation rather than from where it was eventually tried. The fact that the individual is eventually tried by the military does not indicate that the foreign officials are agents of the military or that the investigations are so intertwined that rights' warnings would be required. As amplified by Mil.R.Evid. 305(b)(1), civilian investigators are required to give warnings when the two investigations are merged into one or the civilian becomes an agent or instrument of the military. Drafter's Analysis, Mil.R.Evid. 305(b)(1), 1984 Manual, *supra* at A22–13 (Change 3). Otherwise, Article 31 warnings are not required from FBI agents, CIA agents, or state law enforcement officials.

■ Based upon our case law, treaty obligations, and the factual findings of the judge and appellate court below, we conclude that the minimal involvement of Air Force personnel in the British investigative effort did not trigger a rights' warning requirement under Article 31(b) or application of the Fourth Amendment. Here, the British had sole jurisdiction over British nationals and American dependents who were the principal targets of the drug investigation. American personnel were required under treaty obligations to assist the British in arresting appellant. Additionally, British nationals were not permitted access to the classified area where appellant worked without being escorted by someone from appellant's unit. Finally, there is no evidence of a subterfuge by Air Force personnel to evade the requirements of Article 31(b). *Cf. United States v. Moreno*, 36 MJ at 114 (mental health worker's inquiry was not so "merged" with a military law enforcement or unit investigation as to require Article 31(b) warnings).

■ Having concluded that this was a British investigation, we must now examine the interrogation in light of *Penn*, *Jones*, and Mil.R.Evid. 305(h)(2). While the mere presence alone of the American officials does not require rights' warnings, the question is whether there was participation in the interrogation by the first sergeant and the OSI agent.

There are two inquiries that must be made. First, was the first sergeant acting as an agent of the police because of his superior rank and official position? *See United States v. Pittman*, 36 MJ 404, 407 (CMA 1993). If so, did the Americans interrogate appellant? *See Rhode Island v.*

*Innis,* 446 U.S. 291, 301 n.7, 100 S.Ct. 1682, 1690 n.7, 64 L.Ed.2d 297 (1980). As appellant himself testified, the first sergeant was acting as a support person, a trusted individual whose presence he valued as security, not someone present because of his official position. Hence, the first sergeant was not acting as an agent of the police.

Additionally, the first sergeant did not "interrogate" appellant by nodding his head. An interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S at 301, 100 at S.Ct. 1689–90 (footnote omitted). The single statement by the OSI agent to tell the truth or be silent did not constitute an interrogation. The statement was not followed by a statement that this would be brought to the attention of the appropriate officials for leniency. *Cf. United States v. Dell'Aria,* 811 F.Supp. 837, 844–45 (E.D.N.Y.1993), and cases cited therein. The British police already had arrested appellant's supplier and were searching appellant's home. Appellant's assertion that he did not know what they were talking about was obviously a lie. At this point the British police knew of appellant's involvement, and a search of his quarters was initiated. Thus a *comment,* not a question, to tell the truth or be quiet under the known facts at this time was good advice.

The actions by the American representatives who were present at the interrogation were not attempts to persuade appellant to waive his rights or incriminate himself. Appellant had already waived his rights and was talking freely, albeit untruthfully. The OSI agent merely exhorted appellant to speak truthfully, *if* he chose to speak at all. Cf. *United States v. Oakley,* 33 MJ 27, 32 (CMA 1991). The agent's comment was not intended to elicit a response, and it was not interpreted by appellant as such.

## D. Conclusion

It is important that American representatives be present to protect the rights of servicemembers being investigated by foreign officials. In *DeLeo* the Court asserted that

the serviceman, who is under investigation by the police of a foreign nation, is present in that country by reason of military orders. Having sent him there, the United States labors under a duty to protect him—so far as properly can be—with respect to the criminal procedures of that foreign government. As a part of such protection, it has been thought desirable to arrange for the presence of an American representative at the foreign trial of any military person. Since pretrial investigation may be as important as that of the trial in the fixing of guilt or innocence, it is also desirable that American agents be present during an investigation by the police of another nation into an offense of which a member of an American military service is suspected.

5 USCMA at 155, 17 CMR at 155 (citations omitted).

Although we do not conclude here that the presence and cooperation of American military officials was a subterfuge to avoid Article 31(b) or Fourth Amendment requirements, we caution all American military personnel involved in foreign investigations to be mindful of Article 31(b) and the Fourth Amendment. *See United States v. Moreno,* 36 MJ at 114.

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and GIERKE concur.

WISS, Judge (concurring in part and in the result):

I agree with most of the majority opinion. The single point on which I disagree, however, does not cause me to reach a different result; that point has to do with appellant's first sergeant and the role he played during the British interrogation.

Under treaty obligations, and consistent with Article 31, Uniform Code of Military Justice, 10 USC § 831, U.S. military officials may "assist" foreign officials in the latter's arrest of an American servicemember pursuant to the foreign nation's exercise of jurisdiction (*see* 38 MJ at 424)—an action designed to meet such practical problems as those encountered by the British agents here, like appellant's being on an American base, his working in a secured area, etc. Further, again consistent with Article 31, U.S. military officials may be "present during" investigations, interrogations, and trials of American servicemembers by host, foreign countries. *See United States v. Morrison,* 12 MJ 272 (CMA 1982); *United States v. Jones,* 6 MJ 226 (CMA 1979); *United States v. Penn,* 18 USCMA 194, 39 CMR 194 (1969); *United States v. DeLeo,* 5 USCMA 148, 17 CMR 148 (1954). These functions evenhandedly facilitate the practical pursuit of legitimate foreign law enforcement efforts and, at the same time, monitor those efforts to assure fair treatment of American servicemembers.

The majority opinion seeks to isolate any action by the first sergeant during the interrogation from the circumstances to be considered in deciding whether U.S. officials went further and, instead, participated in the foreign interrogation so as to trigger Article 31. It certainly is true, as the majority points out, that the first sergeant was "a trusted individual whose presence [appellant] valued as security, not someone present because of his official position." 38 MJ at 427. Appellant's blind trust that his first sergeant truly would respond in his best interest, however, does not negate the fact that the first sergeant was there *as* an official of the United States—else he would not have been permitted in the interrogation at all.

In short, notwithstanding that appellant trusted his first sergeant, the first sergeant was appellant's immediate reporting superior and was there only because he was an official of the United States. Thus, he cannot be discounted from the equation.

*Cf. United States v. Kimble,* 33 MJ 284, 291 (CMA 1991).

Nonetheless, I do not believe that the first sergeant's action amounted to "participation" in the sense that requires reversal of this conviction. As this Court indicated in *United States v. Jones,* 6 MJ at 230, the key to whether American officials' actions will trigger Article 31 is "an element of causation between the American activity and the production of incriminating evidence." Under the specific circumstances of this case, I conclude that appellant's decision to cooperate was based on the total picture facing him at that moment. As the military judge phrased a similar conclusion, appellant "decided on his own that the British police knew everything already and that discovery of the drugs was inevitable." Finding of Fact Nine, 38 MJ at 423.

SULLIVAN, Chief Judge (dissenting):

I respectfully dissent from the majority opinion. It implies that Air Force Office of Special Investigations (OSI) Special Agent (SA) Sterne and appellant's first sergeant were present at his interrogation to protect appellant's rights. It also suggests that "their presence and cooperation" at this interrogation was at best insensitive to Article 31, Uniform Code of Military Justice, 10 USC § 831, and the Constitution. Such a benign view of these military authorities' participation in appellant's interrogation and resulting confession strikes me not only as unjustified but also as incredulous. *See United States v. Raymond,* 38 MJ 136 (CMA 1993).

I am also troubled by the majority opinion's conclusion that the original investigation which led to appellant's interrogation was British and not a joint operation with American military authorities. The initial question under Mil.R.Evid. 305(h)(2), Manual for Courts–Martial, United States, 1984, is whether American military authorities "instigated" appellant's interrogation by the British. I do not believe that conclusory testimony by British and American military police that this was a British investiga-

tion controlled by British police is a sufficient basis to decide this question. Moreover, I also do not consider dispositive the exclusive jurisdiction of the British over British nationals and American dependents under treaty agreements. Finally, evidence of record showing the American military police's role in causing the British to *initiate* this criminal investigation cannot be simply ignored.

I would hold clearly erroneous the findings that American military authorities did not "instigate" or "participate" in appellant's interrogation by British police as delineated in Mil.R.Evid. 305(h)(2). *See United States v. Jones*, 6 MJ 226, 229–30 (CMA 1979); *United States v. Grisham*, 4 USCMA 694, 696, 16 CMR 268, 270 (1954); *cf. United States v. Oakley*, 33 MJ 27 (CMA 1991). *See generally United States v. Maturo*, 982 F.2d 57, 61 (2d Cir.1992).

– – –

I

*Facts*

The evidence of record indicates that in April 1990 SA Lemelin of OSI obtained information from a confidential source that appellant and several of his friends, both military and civilian personnel, may have been involved in illegal drug activity at RAF Alconbury. The source provided several statements which incriminated appellant. Prior to that point, SA Lemelin had been providing the British police with daily information reports regarding the investigation of appellant, to include information gained by AFOSI-conducted surveillance of appellant's off-base residence. The confidential source provided the British police with the information used in their investigation.

On July 24, 1990, the British police arrested a dependent spouse of an active-duty military member, based on information provided by the confidential source. The dependent spouse, who was appellant's neighbor, was found in possession of cannabis resin (hashish) and lysergic acid diethylamide. During questioning by British police, the dependent spouse admitted providing appellant and appellant's wife with drugs on various occasions. The British police decided to arrest both appellant and his wife. The British police coordinated with the AFOSI regarding the apprehensions. Detective Scotney and Detective Newton of the Cambridgeshire police met with SA Sterne of OSI and proceeded to appellant's duty station. The group met Master Sergeant Keister, appellant's first sergeant, at appellant's duty station. SA Sterne had requested MSgt Keister's presence during the arrest.

Detective Scotney testified that after he and Detective Newton identified themselves as British police, he advised appellant that he was "not obligated to say anything and if [he chose to] do so, what [he said] may be given in evidence." Appellant looked at the British officers' identifications and then asked his first sergeant if the British officers had authority to arrest him at his duty station. MSgt Keister replied that they did.

Appellant testified that, after he denied involvement in any illegal drug activity, SA Sterne "interjected" that "[i]t's better for you to tell the truth than to lie." SA Sterne testified that "I told him it would be better if he remained quiet than to continue lying." MSgt Keister testified that he "heard Agent Sterne say something to the effect that '... it's better if you don't talk at all if you're going to lie.'" After SA Sterne's statement, one of the Cambridgeshire police officers said that it would be "easier on" appellant if he helped the police. MSgt Keister further testified that appellant then looked at him and that he, the first sergeant, nodded to appellant, conveying agreement with the officer that it would be easier on appellant if he cooperated. After about one minute, appellant confessed that there were drugs in his residence.

SA Sterne reported the presence of drugs in appellant's residence to AFOSI headquarters via radio transmissions. SA Sterne asked the British police if they had brought their handcuffs, and after they

stated that they had not, he put his handcuffs on appellant's wrists and directed him out of the duty section. Appellant was taken to the Cambridgeshire police station where he was questioned.

Simultaneously with appellant's arrest, SA Lemelin and "Woman Detective Constable" McCready of the Cambridgeshire police went together to arrest appellant's wife at the RAF Upwood base shoppette where she was working. They transported appellant's wife to her and appellant's residence. A warrant to search the residence had been obtained but was not executed because it did not correctly identify appellant's residence as the place to be searched. The British police, with SA Lemelin in attendance, conducted a search pursuant to British law—§ 18 of the Police and Criminal Evidence Act of 1984. Section 18 authorizes a search of an individual's residence when the person has been arrested and reasonable suspicion exists to believe that evidence of the crime for which the person has been arrested or a similar crime may be found at the residence.

During the search of appellant's residence, appellant's wife told the police where the hashish could be found. SA Lemelin used information received from SA Sterne by radio transmissions regarding instructions appellant provided SA Sterne to direct the British police to where they could find LSD in a box in the corner of a cupboard in the residence.

At trial, defense counsel made a written motion to suppress appellant's admissions and any derivative evidence thereof that were made to the British police in the presence of SA Sterne and MSgt Keister.[1] Defense counsel argued in the motion that the actions of SA Sterne and MSgt Keister "went beyond mere presence or making" appellant "available for interrogation by foreign officials" and, instead, "amounted to 'participation' in the interrogation." The defense conceded that the interrogation was "initiated by" Detectives Scotney and

Newton. Defense counsel further argued that appellant's confession was a "reasonable consequence" of SA Sterne's verbal statement and MSgt Keister's nonverbal gesture.

Government counsel retorted by arguing that the British police were "not acting as an instrumentality of the AFOSI or the Air Force." Furthermore, trial counsel argued that SA Sterne's and MSgt Keister's "presence and minimal involvement never transferred the control of the investigation or interrogation to military authority."

The military judge made extensive findings of fact and conclusions of law about the investigation and subsequent arrest and questioning of appellant and his wife. Essentially, the military judge found that the investigation was a British operation and that, while AFOSI and British police shared information, it was not a joint investigation. The military judge also concluded that the presence of SA Sterne and MSgt Keister during appellant's arrest and questioning, and the presence of SA Lemelin at appellant's residence during the search by Detective McCready "did not transform" the interrogation or search into one "conducted, instigated, or participated in by [U.S.] military personnel." The military judge ruled that the statement by appellant during the questioning on July 25, 1990, and the evidence seized during the search of appellant's residence were admissible under Mil.R.Evid. 305(h)(2) and 311(c), respectively. Since the statement and seized items were admissible, the military judge found no taint attached to any later statements made by appellant.

On appeal to the Court of Military Review, appellant "maintain[ed] the trial judge erred in admitting the statements he ... made to British investigators and the evidence seized as a result of those statements." 36 MJ 589, 592 (1992). Relying on *United States v. Jones*, 6 MJ 226 (CMA 1979), the court below held "that any Air Force involvement in appellant's initial in-

---

**1.** Appellant entered conditional pleas of guilty in this case. *See* RCM 910(a)(2), Manual for Courts–Martial, United States, 1984.

terrogation never exceeded a 'mere presence.' " The Court of Military Review stated that the actions of Air Force personnel prior to and during the interview did not "reach[ ] the level of 'participation' necessary to turn the British interrogation of the appellant into a United States interrogation. Therefore, no Article 31 or *Miranda* [*infra*] requirements were invoked when British officials interviewed the appellant." 36 MJ at 592 (citations omitted). The court went on to hold that there was no other basis for excluding the statements made to the British police, citing Mil.R.Evid. 305(h)(2).

– – –

## II

### *Adequacy of Warnings*

The first granted issue concerns admissibility of appellant's initial confession to British Police on July 25, 1990. Appellant expressly sought suppression of this evidence under Mil.R.Evid. 305(h)(2). *See generally* Mil.R.Evid. 304(a) and 305(a). *See also* Art. 31(d) and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He contended that military personnel participated in his interrogation by foreign police. Thus, he asserted that the prosecution was required to show that he was provided certain rights' advisement before any statements made during this interrogation could be admitted against him at his court-martial. *See* Mil.R.Evid. 305(h). *See also United States v. Grisham,* 4 USCMA at 697, 16 CMR at 271; *United States v. Covington,* 783 F.2d 1052, 1056 (9th Cir. 1985).[2] On appeal he implies that "suffi-

cient participation" existed in his case as a matter of law.

A preliminary question in this case is the legal sufficiency of the warnings given by the British police prior to questioning appellant. I note that the Court of Military Review found that they only "cautioned the appellant that he did not have to say anything unless he wanted to, but that if he did say anything it could be used as evidence." 36 MJ at 591. My initial concern, therefore, is whether these warnings satisfy Article 31(b) and *Miranda v. Arizona, supra.* If not, there is no need for further review on the first granted issue.

Mil.R.Evid. 305(c), which delineates the rights' advice required by Article 31,[3] states:

(c) *Warnings concerning the accusation, right to remain silent, and use of statements.* A person subject to the code who is required to give warnings under Article 31 may not interrogate or request any statement from an accused or a person suspected of an offense without first:

(1) informing the accused or suspect of the nature of the accusation;

(2) advising the accused or suspect that the accused or suspect has the right to remain silent; and

(3) advising the accused or suspect that any statement made may be used as evidence against the accused or suspect in a trial by court-martial.

Moreover, Mil.R.Evid. 305(d) delineates the rights' advice required by *Miranda v. Arizona, supra:*[4]

---

**2.** *See United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.1983); *United States v. Heller,* 625 F.2d 594, 599–600 (5th Cir.1980); *United States v. Molina–Chacon,* 627 F.Supp. 1253, 1262–63 (E.D.N.Y.1986). *See also United States v. Verdugo–Urquidez,* 856 F.2d 1214, 1224–25 (9th Cir. 1988).

**3.** Article 31(b), UCMJ, 10 USC § 831(b) provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does

not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

The right to counsel is "[a]ncillary to Article 31" and the accused must be warned of that right prior to interrogation. *United States v. Moreno,* 36 MJ 107, 113 (CMA 1992) (relying on Mil. R.Evid. 305(d), Manual, *supra* ).

**4.** In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court imposed the following requirements:

(d) *Counsel rights and warnings.*

(1) *General rule.* When evidence of a testimonial or communicative nature within the meaning of the Fifth Amendment to the Constitution of the United States either is sought or is a reasonable consequence of an interrogation, *an accused or a person suspected of an offense is entitled to consult with counsel as provided by paragraph (2) of this subdivision, to have such counsel present at the interrogation, and to be warned of these rights prior to the interrogation ....*

(Emphasis added.) Clearly these warnings' requirements were not satisfied in appellant's case. *See United States v. Jones*, 6 MJ at 227; *cf. United States v. Kline*, 35 MJ 329, 335 (CMA 1992).

### III

### *Need for Warnings*

My next concern then is whether the Military Rules of Evidence required sufficient warnings be shown before appellant's confession could be admitted at his court-martial. Appellant has not suggested that all confessions taken by foreign police must be preceded by Article 31 warnings or *Miranda* warnings before they are admissible at courts-martial. Instead, I note that Mil.R.Evid. 305(h)(2) limits such a foundational requirement to cases where American military personnel have "conducted, *instigated, or participated in*" the foreign interrogation. *See United States v. Jones, supra* at 228–29 (instrumentality test); *United States v. Oakley, supra* at 32. *See also United States v. Covington*, 783 F.2d 1052 (agency and joint venture test). I will review factfinders' determinations on these questions under a clearly erroneous standard of review. *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir.1992); *United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir.1986); *cf. Lau v. United States*, 778 F.Supp. 98, 100–01 (D.P.R.1991) (Dist. Ct. standard). *See generally* S. Childress

and M. Davis, *Federal Standards of Review* § 10.04 at 10–14 to 10–15 (2d ed.1986) (reversal of trial judge's factual findings permitted, "even those supported by substantial evidence, if the record as a whole leaves the court with a definite and firm conviction that a mistake was made below"); *see United States v. Rice*, 995 F.2d 719, 722 (7th Cir.1993); § 11.13 at 11–53 to 11–54 (appears to be a mixed question of law subject to "independent review" with some deference to factfinder).

This Court has characterized the instigation question as one asking whether the foreign police were in fact an instrument of the military used to evade Article 31 or the *Miranda* requirements. *See, e.g., United States v. Swift*, 17 USCMA 227, 38 CMR 25 (1967); *United States v. Plante*, 13 USCMA 266, 32 CMR 266 (1962); *United States v. Grisham*, 4 USCMA 694, 16 CMR 268 (1954); *all cited with approval in United States v. Jones*, 6 MJ at 228. In these cases, this Court looked at the reasons for and the methods of the foreign investigation. In determining the participation question, we have looked at the degree of involvement of American military personnel in the interrogation.

In *Grisham*, this Court stated that the "yardstick" for imposing Article 31(b) warnings' requirements is when foreign authorities "conduct an interrogation or request a statement in furtherance of any military investigation, or *in any sense as an instrument of the military.*" 4 USCMA at 697, 16 CMR at 271 (emphasis added). This "instrumentality test" was adopted in the context of an independently initiated investigation by French police. Grisham had summoned both French civilian and American military police to his residence after killing his wife. The French police immediately "took charge of the investigation" and requested an interpreter from the Army. Accordingly, we concluded that the French police were not

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used

as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

acting in furtherance of a military investigation. The Court also specifically noted that "[t]he American functionary present [during the initial interrogation of Grisham] propounded no questions, nor did he seek to dictate the route taken during the interrogation." Thus, we also concluded that the military police "did not participate" in the actual interrogation. *Id.* at 698, 16 CMR at 272.

In *Plante,* the French police were conducting an investigation of a French national for possession of black-market American-military items in France. This Court concluded that the French authorities were not "acting as the instrument of the American military authorities." 13 USCMA at 271, 32 CMR at 271 (citing *United States v. Grisham, supra*). Furthermore, upon delivering Plante to the French police headquarters, two U.S. military investigators remained present during the interrogation by the French police. The record, however, further supported the conclusion that "[n]either [U.S. military investigator] who was present *took any part* in the questioning by French authorities, and it is denied that the French were used as a conduit through which to pose questions they suggested." *Id.* at 269, 32 CMR at 269 (emphasis added).

In *Swift,* German civilian police found the dead body of a German national in a hotel room in Frankfurt, Germany. An "[i]nvestigation by German police led to the accused, who was in Germany on temporary duty and had registered at the hotel." 17 USCMA at 229, 38 CMR at 27. An interview of appellant by German police was conducted off "base in [the] custody of the German police[,]" *id.* at 230, 38 CMR at 28, to determine "whether to continue German control over the accused or to relinquish it to the American authorities[,]" *id.* at 232, 38 CMR at 30. This Court concluded, as a matter of law, "that the two investigations" did not "merge[ ]into an indivisible entity." Moreover, the Court found that there were no U.S. military officials present in the room while "any significant remark was [being] made by the accused." *Id.* at 232, 38 CMR at 30.

In *United States v. Jones,* 6 MJ 226, this Court held that "the mere presence" of military personnel at the interrogation was insufficient to invoke Article 31(b) warnings' requirements under "the instrumentality test." It recognized, however, "that persons subject to the Code could not evade the requirements of ... Article [31(b)] by utilizing 'the services of a person not subject to the Code as *an instrument* for eliciting disclosures without warning.'" *Id.* at 228 (emphasis added) (quoting *United States v. Grisham,* 4 USCMA at 696, 16 CMR at 270). Moreover the Court also considered the participation-in-the-interrogation question and hypothetically applied *"a direct producing cause"* test to determine whether a showing of a proper rights' advisement under *Miranda* was required before the statement could be admitted at courts-martial. 6 MJ at 230. Such a standard satisfies the more than "innocuous" and "relatively inconsequential" language found in *United States v. Oakley,* 33 MJ at 32, as well as the "mere presence" standard of our earlier cases.

I recognize that mere presence of American military authorities at the interrogation or their conduct as an interpreter does not constitute sufficient participation to require proof of the warnings. *See United States v. Jones, supra* at ·229. Mil.R.Evid. 305(h)(2) similarly states:

(2) *Foreign interrogations.* Neither warnings under subdivisions (c) or (d), nor notice to counsel under subdivision (e) are required during an interrogation conducted abroad by officials of a foreign government or their agents *unless such interrogation is conducted, instigated, or participated in by military personnel* or their agents or by those officials or agents listed in subdivision (h)(1). A statement obtained during such an interrogation is involuntary within the meaning of Mil.R.Evid. 304(b)(3) if it is obtained through the use of coercion, unlawful influence, or unlawful inducement. *An interrogation is not "participated in" by military personnel or*

*their agents or by the officials or agents listed in subdivision (h)(1) merely because such a person was present at an interrogation conducted in a foreign nation by officials of a foreign government or their agents, or because such a person acted as an interpreter or took steps to mitigate damage to property or physical harm during the foreign interrogation.*

(Emphasis added.) Nevertheless, our cases also suggest that any affirmative conduct by military police toward a servicemember during a foreign interrogation is a critical factor to be considered on the question of participation. *Cf. United States v. Oakley, supra.*

## IV

### Application

Turning to appellant's case, I first note that this investigation was at the very least a joint operation between British police authorities and American military personnel. *See United States v. Verdugo–Urquidez,* 856 F.2d 1214, 1227–28 (9th Cir.1988). Admittedly "the furnishing of information which results in the interrogation of an accused by foreign police agents is insufficient action to require *Miranda* warnings." *United States v. Morrison,* 12 MJ 272, 277 (CMA 1982) (quoting *United States v. Jones, supra* at 229). Likewise, "merely ma[king] appellant available to the foreign authorities" is insufficient involvement to invoke rights-warnings' requirements. *See United States v. Jones, supra* at 230. However, initiation of this investigation by American military police, the extensive coordination and reporting between the two police agencies in this case, and the substantial efforts made by American military police in assisting this investigation exceeded the relatively passive role contemplated by our case law. This clearly constituted

instigation within the meaning of Mil. R.Evid. 305(h)(2). *Cf. United States v. Murphy,* 18 MJ 220, 223 (CMA 1984); *United States v. Bell,* 7 MJ 108, 110 (CMA 1979); *United States v. Holder,* 10 USCMA 448, 451–52, 28 CMR 14, 17–18 (1959).

Turning to appellant's actual interrogation, it is undisputed that military personnel did speak and act during appellant's custodial questioning by British police. Moreover, such conduct cannot reasonably be said to be innocuous or inconsequential under the circumstances of this case. *Cf. United States v. Oakley, supra.* During the interview, SA Sterne admonished appellant to stop his lying, a common interrogation ploy. *See* F. Inbau, J. Reid, and J. Buckley, *Criminal Interrogation and Confessions* 126–27, 142–53, 312 (3d ed. 1986). *See generally United States v. Leiker,* 37 MJ 418 (CMA 1993). Additionally, MSgt Keister made a nonverbal gesture to appellant just prior to his confession, *i.e.,* nodding his head to demonstrate to appellant that he agreed with Detective Scotney that it would be easier if appellant cooperated. Inbau, Reid, and Buckley, *supra* at 314–18. Finally, the record shows that, although appellant was initially reluctant to admit involvement with drugs, he confessed immediately after this prompting. *Cf. United States v. Oakley, supra* at 32; *United States v. Ravine,* 11 MJ 325, 330 (CMA 1981). In light of this Court's past cases, I conclude that the opinion of the Court of Military Review equating these factual circumstances to mere presence, not participation, was clearly erroneous.[5] *See generally United States v. Schake,* 30 MJ 314, 318 (CMA 1990); *United States v. Travers,* 25 MJ 61, 62 (CMA 1987).

---

**5.** The judge found as fact that there was a verbal admonishment by the OSI agent during the interrogation by British police. Yet he concluded that there was insufficient participation without reconciling this undisputed fact. To the extent

that this holding implies that admonishments by military authorities falling short of questions can be ignored regardless of the circumstances, I also find legal error. *See United States v. Oakley,* 33 MJ 27, 32 (CMA 1991).

Therefore, I would reverse the decision of the United States Air Force Court of Military Review.[6]

6. Likewise, in view of my handling of Issue I in favor of appellant, I do not reach the issue whether AFOSI personnel participated in the search of appellant's residence for the purposes of Mil.R.Evid. 311(c).