CRAWFORD, Chief Judge
(concurring in the result):
The majority is incorrect to find an abuse of discretion, when the “courts have been very liberal in admitting witnesses’ testimony as to another’s state of mind____” United States v. Hoffner, 777 F.2d 1423, 1425 (10th Cir.1985). See John Hancock Mut. Life Ins. Co. v. Dutton, 585 F.2d 1289, 1294 (5th Cir.1978)(admitted testimony of decedent’s daughter that she did not believe that the decedent thought his wife would ever shoot him). Indeed, the preference under the Military Rules of Evidence [hereinafter M.R.E.] is for admission of evidence unless it is not legally and logically relevant. Appellant’s wife, Mrs. Byrd, could certainly testify as to her reasonable interpretation of the letters, a series of veiled threats by Appellant aimed to influence his wife’s testimony and the testimony of the victim, A.B.
To determine the admissibility of opinion testimony by lay witnesses, M.R.E. 701 requires examination of several factors, some of which the majority ignores and are set forth below. The majority also did not consider the M.R.E. 401-404 rules, the standard of review, or the principles behind M.R.E. 701. Moreover, many cases cited by the majority[1] would permit the admission of these coded veiled messages by Appellant. Certainly, the judge’s decision in admitting the letters was not an abuse of discretion.
Lay opinions generally are inadmissible. Nevertheless, the rule against lay opinions is not an absolute rule and is subject to relaxation. M.R.E. 701 sets forth the prevailing practice and is a rule of preference rather than a rule of exclusion. 1 John W. Strong, et al., McCormick on Evidence § 11 at 48 (1999). M.R.E. 701 provides:[2]
If the witness is not testifying as an expert, the testimony of the witness in the form of opinions or inference is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the "witness or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
This case concerns the first two prongs of this rule. The third prong and the amendments to M.R.E. 702 were added in December 2000 “to eliminate the risk that the reliability requirements set forth in [M.R.E.] 702 would be evaded through the simple expedient of proffering expert in lay witness clothing.” Advisory Committee Notes to Federal Rules of Evidence at 120.
Part of the first prong restates the personal knowledge requirement in M.R.E. 602. That is not an issue here. Another portion of the first prong, which is at issue, is the “rationally based” aspect, that is, the opinion must be a reasonable inference drawn from the facts. The second prong requires the testimony to be helpful to the factfinder’s “clear understanding of the testimony of the witness.” As to this prong, the courts have been surprisingly liberal in admitting lay opinions about the state of mind of third persons. Winant v. Bostic, 5 F.3d 767 (4th Cir.1993)(witness concluded that land devel *12 opers never intended to do what they promise); United States v. Rea, 958 F.2d 1206, 1215 (2d Cir.1992)(“There is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others. Accordingly, these rules do not, in principle, bar a lay witness from testifying as to whether a defendant in a criminal prosecution had the requisite knowledge.”) (citations omitted); United States v. Hoffner, 777 F.2d 1423, 1425 (10th Cir.1985).
M.R.E. 701 allows the witness to draw reasonable inferences based on his or her experience and knowledge of the accused. In this case, Appellant’s wife gave her overall impressions simplifying a very detailed letter. “Knowledgeable witnesses can easily satisfy the rational basis and helpfulness criteria in providing interpretative opinions on the mental states of others.” Christopher B. Mueller & Laird C. Kirkpatric, Evidence § 7.4 at 615 (3d ed.2003).
When it is impractical for a witness to verbalize all the data, the witness’s inferential testimony is generally admissible. Id. at 614-15. Lay people have been able to express opinions on identity, conduct, competence, feelings, light or darkness, sound, size, weight, distance, speed, and an endless number of other things. McCormick, supra, at § 11 at 47-48 n.22 (citing Ladd, Expert Testimony, 5 Vand. L.Rev. 414, 417 (1952)). The Federal Rules of Evidence Advisory Committee Note observes:
The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness.
This is especially true where the witness attempts to choose up sides. Id.
The courts have been more receptive to lay opinions about the state of mind of third parties. Id. at 50. A number of courts have allowed a person to testify about another’s state of mind, i.e., grief, intent, and so forth. This is true so long as it is clear that the witness is expressing an opinion that can be treated like other witnesses, and the testimony can be rejected. Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir.1997)(witness cited “objective facts” supporting opinion); Hoffner, 777 F.2d at 1425-26(“Courts have been very liberal in admitting witnesses’ testimony as to another’s state of mind if the witness has had sufficient opportunity to observe the accused so as to draw a rational conclusion about the intent of the accused.... Determination of the preliminary questions of perception and helpfulness are within the discretion of the trial court.”); United States v. McClintic, 570 F.2d 685, 690 (8th Cir.1978)(witness could testify that the defendant knew the goods he received were fraudulently obtained when the witness had heard the defendant discussing the scheme for obtaining the goods).
The standard of review for evidentiary rulings is whether the judge abused his discretion. The judge in this case did not. The abuse of discretion standard requires not that the judge was wrong, but rather was clearly wrong. As we have stated, it is not that the judge is maybe wrong or probably wrong, but rather “it must strike a cord of wrong with the force of a five-week-old, unrefrigerated dead fish.” United States v. French, 38 M.J. 420, 425 (C.M.A.1994)(quoting Parts & Electric Motors Inc. v. Sterling Electric, Inc., 866 F.2d 228, 233 (7th Cir.1988)).
At a session pursuant to Article 39(a), Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. 839(a) (2000), the trial counsel laid a foundation for Mrs. Byrd’s opinions by establishing that she had known Appellant for fourteen years and had been married to him for eight. Additionally, Mrs. Byrd was familiar with Appellant’s handwriting from checks, letters, and other documents. At the Article 39(a) session, the judge overruled the defense’s objection, based on M.R.E. 403 and speculation, to Mrs. Byrd’s opinion. Nevertheless, prior to admitting her opinion at trial, the trial counsel laid an additional foundation by admitting and playing the taped conversations from the answering machines. Additionally, the trial *13 counsel selected only the passages highlighted and mentioned below.
Prior to the testimony concerning these passages, the prosecution, without defense objection, played a number of messages left by Appellant on his wife’s answering machine. During these conversations, he stated:
If my daughter wants that furniture, she can have it. I’m not getting furniture for you. I’m getting it for my daughter. ’cause I’m not throwing smoke up nobody’s butt. I’m dead serious. You need to get with me. Trust me. Or say bye bye to the furniture.
I want to be sure that you’re—you’re still good to go. No matter what you feel, it’s—the bottom line is, I need you as much as I think you need me. So don’t get personnel [sic]. Let’s just stick with what we need to do to get things done.
These taped messages from Appellant provided not only a factual context for many of Appellant’s written remarks, but also evidenced a level of spousal and familial communication that, over a period of 8-14 years, was certainly sufficient foundation for the opinions Mrs. Byrd expressed on the stand.
Moreover, Appellant evinced a tendency to speak in cryptic, obfuscatory terms. A majority of courts permit a witness to interpret “coded or ‘code-like’ conversations.” United States v. Dicker, 853 F.2d 1103, 1108-09 (3d Cir.1988). Appellant was clearly trying to convey a deeper meaning via suggestion, oblique reference, and innuendo. Indeed, this is a case of a husband not speaking in plain terms, but coded language. Who best to interpret what he means than a wife who has known him for several years? It reminds me of the 1945 German request for the surrender of Bastogne when the 101st Airborne Division Commanding General said, “Nuts.” I suppose we could ask the people who knew the General what “nuts” meant. Would that be admissible? That is what this case is about. In short, to the extent that a witness had sufficient familiarity with Appellant’s communicative form, the military judge correctly ruled that it would be helpful to the members to have that witness explain what Appellant was likely talking about in his letters.
The tape and its foundation were heard by the members before they heard Mrs. Byrd’s opinion on the letters (which had been admitted without objection just before the tape played). Thus, by the time the questioned opinion came before the members, there was a much greater foundation than there had been in the Article 39(a) session. After the members heard the tape, but before they heard her opinions on the letters, Mrs. Byrd gave her opinion on what other passages on the tape meant. Some of these cover the same subject matter as the letters.
Mi’s. Byrd’s testimony, in total, added significant detail to the factual setting against which her opinions were set before the members, and reinforced a level of familiarity with her husband’s communicative habits consistent with a lay opinion under M.R.E. 701.
Before hearing the questioned opinions, the members also heard Mrs. Byrd testify to the reasonable inferences that could be drawn from the taped telephone messages from Appellant which were similar in meaning to the letters and issue in this case. She testified that Appellant had “kind of used the furniture almost like a bargaining tool.” After hearing the tape, Mrs. Byrd explained, over objection, Appellant’s vague references to the furniture, by saying, “I took it that he had called Helig Meyers and told them to come pick up the furniture and that [A.B.] was the only one that was going to be able to decide if we were going to keep the furniture” and “if she didn’t keep saying ... that the abuse didn’t happen, then he was going to have them come pick up the furniture.” Explaining Appellant’s taped remark that “if you ever do anything for me on Thursday morning, you can take me up there with A.B.” Mrs. Byrd said, without objection, that A.B. was to testify at a grand jury hearing on Thursday and Appellant was asking to ride along back to Cadiz, Kentucky. When asked to explain Appellant’s taped remark that he “needs to get some answers to some things,” Mrs. Byrd testified, without objection, that that meant their “relationship, the divorce, *14 how we were going to testify at the [Article 39(a) ] hearing.” She felt that “he was laying the choice at the feet of a child.”
Mrs. Byrd testified that “since the furniture was in his name and not in mine, even thought [sic] I was making the payments, they could come take it out anytime he called.” Mrs. Byrd testified that she had known Appellant 13-14 years and had been married to him for 8. After getting married, they had lived at Fort Sill, Baumholder, Huntsville, and Cadiz. Mrs. Byrd lived in Huntsville alone for nine months while Appellant was in Bosnia.
As to each passage the judge admitted, I offer the following views.

Passage One

I agree with the majority that “Appellant’s meaning in this passage is unclear,” but only to someone who did not know him over a period of time and had not engaged in other conversations with him. Mrs. Byrd had already testified that Appellant was the primary breadwinner and controlled the family funds. And if A.B. didn’t testify his way, the family would suffer economically. That is exactly what this passage meant. Thus, her testimony was admissible on that point and satisfied all three requirements of M.R.E. 701.

Passage Two

The same rationale applies for the admission of her testimony concerning this passage. It is clear that he would be “unable to help financially,” meaning that if she wanted financial help, A.B. should not testify as to what she has been telling the investigators.

Passage Three

As to this passage, it is permissible for the wife to say, or interpret this passage to mean, that he is going to go to prison unless the family helps him—again satisfying all three requirements of M.R.E. 701. The judge’s ruling is not an abuse of discretion. The language as to this passage, “she’s going to stick by me,” and in court say it didn’t happen, was consistent with her other testimony. She had already testified that Appellant had at least implied that he wanted A.B. to testify favorably for him. Thus, this evidence was already present, and it was not error to repeat this testimony.

Passage Five

This passage was helpful to the factfinders because Mrs. Byrd began her testimony on direct examination by describing Appellant’s admission to her in the ear at Fort Campbell. Because there is nothing new here about which she had not already testified, there could be no error.

Passage Six

Again, this showed Mrs. Byrd’s keen insight in interpreting Appellant’s reference to making $15 a month for the rest of his life as an intimation that he would no longer be able to support the family if they did not testify favorably.

Passage Seven

Mrs. Byrd’s opinion that Appellant is referring to counseling is benign and irrelevant. What hurts Appellant is Mrs. Byrd’s recitation of his admission at the counseling session which is admissible in its own right under M.R.E. 801(d)(2), and thus is not error.

Passage Eight

The prosecutor’s question to Mrs. Byrd was, “[W]hy would he be in prison?” Mrs. Byrd answered, “[I]f he got found guilty of the charges____” This statement was both harmless and irrelevant under the circumstances.
For these reasons, I concur only in the result of the lead opinion.

. See, e.g., United States v. Coleman, 284 F.3d 892 (8th Cir.2002); United States v. Dicker, 853 F.2d 1103 (3d Cir.1988)(and cases cited therein). See also United States v. Garcia, 291 F.3d 127, 140-42 (2d Cir.2002); United States v. Novaton, 271 F.3d 968, 1007-09 (11th Cir.2001); United States v. De Peri, 778 F.2d 963, 977-78 (3d Cir.1985).

. See Amendments to the Federal Rules of Evidence, 529 U.S. 1189, 1194-95 (2000); M.R.E. 1102.