# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39457**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Cameron A. OWENS**
Airman (E-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 24 October 2019[1]

————————————

*Military Judge:* John C. Harwood.

*Approved sentence:* Dishonorable discharge, confinement for 18 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 12 December 2017 by GCM convened at Aviano Air Base, Italy.

*For Appellant:* Major Mark J. Schwartz, USAF (argued); Lieutenant Colonel Michael A. Burnat, USAF.

*For Appellee:* Captain Peter F. Kellett, USAF (argued); Colonel Julie L. Pitvorec, USAF; Lieutenant Colonel Joseph J. Kubler, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, J. JOHNSON, and LEWIS, *Appellate Military Judges.*

Senior Judge J. JOHNSON delivered the opinion of the court, in which Judge LEWIS joined. Chief Judge MAYBERRY filed separately to concur in part and in the result.

————————————

---

[1] We heard oral argument in this case on 8 August 2019 at the University of California, Hastings College of the Law, as part of this court's Project Outreach.

*United States v. Owens*, No. ACM 39457

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

J. JOHNSON, Senior Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of attempted murder, one specification of aggravated assault, and three specifications of unlawful entry in violation of Articles 80, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 928, 934.[2,3] The military judge sentenced Appellant to a dishonorable discharge, confinement for 18 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises two issues on appeal: (1) whether the military judge erred in denying a motion to suppress Appellant's statements made to the Italian police and derivative evidence; and (2) whether Appellant's conviction for attempted murder is legally and factually sufficient. We find that no error substantially prejudiced Appellant's material rights and that the evidence is sufficient, and we affirm the findings and sentence.

## I. BACKGROUND

### A. The Offenses

In March 2017, Appellant arrived at Aviano Air Base (AB), Italy, his first permanent duty station. He spent the evening of 10 April 2017 in and around the Airman dormitories socializing with Airman First Class (A1C) JS, a friend from technical school. Later that night they were joined by a third Airman, and the three returned to A1C JS's dorm room where they eventually fell asleep. Appellant consumed approximately four or five beers over the course of the

———

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ) and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] The military judge found Appellant not guilty of one specification of breaking and entering with the intent to commit murder in violation of Article 129, UCMJ, 10 U.S.C. § 929. In addition, after the military judge entered findings he conditionally dismissed Appellant's conviction of aggravated assault in violation of Article 128, UCMJ, the condition being that the findings of guilty as to attempted murder "survive[ ] post-trial and appellate scrutiny."

2

evening. Appellant awoke at approximately 0320 on 11 April 2017 and departed A1C JS's room alone.

Appellant's subsequent movements were largely captured on security cameras mounted on and around the dormitories. Appellant spent some time walking around one large dormitory in particular,[4] looking in windows and entering several open or unlocked doorways. The rooms in this building were laid out in a "quad"-style format, with four bedrooms sharing a common kitchen and living area. One of the quads that Appellant entered was subsequently discovered to be missing two knives from its kitchen area.

At approximately 0352, Appellant walked to the rear of a first-floor quad shared by A1C AS and three other Airmen. Appellant and A1C AS did not know each other. Appellant climbed over a low wall onto the outdoor patio and entered the quad through an open sliding door. Security camera video indicates he spent approximately 13 or 14 minutes inside the quad.

A1C AS later testified that she was sleeping in her bed when she suddenly felt her "comforter being ripped off of [her] and there was someone standing in front of [her]," and then she felt a knife strike her "in the back of [her] head." Although she never saw the knife, she "felt" it. Appellant continued stabbing her repeatedly in the head and neck. A1C AS raised her arm defensively and felt the knife strike her shoulder and arm. A1C AS "scooted" away from Appellant and lowered her arm. Appellant struck her again with the knife, in the face, and at that point A1C AS screamed for the first time. Appellant then fled from A1C AS's room.

Almost immediately, A1C AS also ran from her room. As A1C AS exited her bedroom to run to the front door of the quad, she saw Appellant fleeing through the patio door to the rear. Bleeding, A1C AS exited her quad, ran across the dormitory courtyard and up stairs to the room of a friend, who called 911. Later that morning, A1C AS was transported to an off-base civilian hospital where her injuries were treated. In the assault, A1C AS suffered a number of sharp-force injuries to her face, her ear, the back of her head, her shoulder, and her forearm, consistent with being struck by a serrated knife blade. However, her injuries were not life-threatening. A1C AS was treated in the hospital emergency room and released the same day.

In the meantime, after leaving A1C AS's quad through the patio door at approximately 0406, Appellant ran to his own dormitory. He first went to the laundry room and then went to his own room at approximately 0410. At 0449,

---

[4] This was not the same dormitory where either Appellant or A1C JS lived.

Appellant left his room wearing his uniform and proceeded to his workplace, where he was scheduled to begin duty at 0500.

## B. The Investigation

Special Agent (SA) JW was the first member of the Air Force Office of Special Investigations (AFOSI) to arrive at the crime scene. He observed that U.S. Air Force security forces personnel had initially secured the scene. SA JW instructed security forces not to let anyone inside the crime scene. However, within a "couple of minutes" after SA JW arrived, two Italian police officers (known as Carabinieri) arrived from the on-base Italian police station. Soon thereafter, the Carabinieri asserted control over the investigation and threatened to arrest SA JW if he did not allow them access to the crime scene, which SA JW did. The Carabinieri then began searching the crime scene.

As the Italian investigation got underway, the AFOSI and security forces essentially conducted a parallel investigation. As part of this investigation, the AFOSI began reviewing the security camera video of Appellant's movements. The AFOSI obtained still images from this video and distributed them to first sergeants on the base in an effort to identify A1C AS's attacker. At approximately 1145 that morning, members of Appellant's unit identified him from the video. At approximately 1300 that afternoon, security forces apprehended Appellant without incident as he was walking back to his dormitory room. The Carabinieri arrived shortly thereafter and took custody of Appellant.

The Carabinieri initially took Appellant to their on-base station. Throughout the time Appellant was in Italian custody, the Carabinieri repeatedly asked him incriminating questions, such as "why did you do it?" At no point while in Italian custody was Appellant advised of his rights under Article 31, UCMJ, 10 U.S.C. § 831, and the Fifth[5] and Sixth[6] Amendments to remain silent and to an attorney. However, Appellant consistently declined to answer questions from the Carabinieri and he repeatedly asked for a lawyer.

After approximately 30 minutes at the on-base police station, the Carabinieri took Appellant to his dorm room, which they searched in Appellant's presence. Although the search was primarily conducted by the Carabinieri, two AFOSI agents were also present and assisted the Italians specifically by using a "black light" to search for body fluids; Appellant saw the agents use the black light on his jacket. The Carabinieri seized a jacket, jeans, shoes, and a cell phone from Appellant's room, but they did not find a knife. The AFOSI did not seize any evidence from Appellant's room that day.

---

[5] U.S. CONST. amend. V.

[6] U.S. CONST. amend. VI.

After the search of Appellant's room, the Carabinieri took Appellant to an off-base police station. There the Carabinieri made additional unsuccessful attempts to interrogate Appellant. Although the officers appeared to become frustrated and angry, they did not threaten or physically abuse Appellant at any point. Appellant continued to request an attorney. Other U.S. Air Force personnel and civilian employees were also present at the station at various times throughout the day, including AFOSI agents, witnesses, and civilian translators. However, at no point did AFOSI agents attempt to question Appellant or participate in questioning by the Carabinieri. Eventually, the Carabinieri told Appellant he would be provided an attorney only if he agreed to make a statement. Appellant agreed to make a statement if he was provided an attorney.

The Carabinieri contacted Mr. LR, an English-speaking Italian civilian attorney. Mr. LR arrived at the police station where he initially met with the Carabinieri for approximately two or three minutes. Mr. LR later testified the Carabinieri informed him that there was security video of Appellant, that the victim had identified Appellant, and that "it seemed he was guilty." Mr. LR did not review the video or any other evidence at that point. After speaking with the Carabinieri, Mr. LR met with Appellant for approximately 10 minutes. Mr. LR told Appellant the Carabinieri had evidence indicating Appellant was "guilty," and he advised Appellant it would be in Appellant's best interest to make a statement.

After meeting with Mr. LR, Appellant agreed to make a statement. Appellant provided his statement orally to a Carabinieri officer and Mr. GZ, a civilian interpreter employed by the U.S. Air Force security forces squadron on Aviano AB. As Appellant spoke, Mr. GZ orally translated Appellant's statements and the Carabinieri officer would type the statements in Italian onto a computer. After Appellant gave his statement, a paper copy was printed out for Appellant to sign. Mr. GZ subsequently testified that he translated the statement back to Appellant before it was signed. However, the paper copy presented to Appellant for his signature was only in Italian, which Appellant could not read. Mr. LR reviewed the statement before Appellant signed it, and Mr. LR and Mr. GZ also signed it. Although the statement differed from A1C AS's recollection of events in important respects, it contained numerous incriminating admissions. The statement admitted, *inter alia*, that Appellant had taken a knife from one of the rooms he had entered, had entered the victim's quad through the patio door, had gone into the victim's room with the knife in his hand, and had struck her with the knife approximately four times, although according to Appellant he struck her only after she awakened on her own and started to scream.

After Appellant signed the statement on the night of 11 April 2017, he was taken to an Italian jail cell. From the time Appellant was picked up on Aviano AB until he was taken to jail he neither received nor asked for either food or water. Appellant remained at the jail until approximately mid-day on 13 April 2017.

On 12 April 2017, the Italian prosecutor contacted the Aviano AB legal office regarding Appellant's case. The prosecutor spoke with Dr. SP, an Italian legal assistant employed at the Aviano AB legal office who assisted the base staff judge advocate with criminal jurisdiction matters, among other duties. The prosecutor told Dr. SP that it appeared the United States would have the primary right to exercise jurisdiction over Appellant under the North Atlantic Treaty Organization (NATO) Status of Forces Agreement (SOFA), and he inquired whether the United States intended to assert jurisdiction. The following day, 13 April 2017, Dr. SP accompanied the staff judge advocate to the prosecutor's office to present a formal written notice of the United States' assertion of jurisdiction. The prosecutor indicated the Italian investigation would cease and that he would turn all the evidence over to United States authorities. Appellant was released from Italian confinement to his first sergeant and entered military pretrial confinement on the same day.

Appellant did not make a statement to the AFOSI. AFOSI agents sought and obtained authorizations to search Appellant's dorm room and to obtain a DNA sample from Appellant. The affidavit accompanying the requests for these authorizations included information from Appellant's 11 April 2017 statement to the Carabinieri. AFOSI agents searched Appellant's dorm room on 14 April 2017 and found a knife wrapped in a paper towel inside a shoe box.

Forensic analysis of bloodstains found on the jacket, jeans, and knife seized from Appellant's room indicated the presence of blood that matched A1C AS's DNA profile.

**C. Trial**

Before trial, the Defense moved to suppress, *inter alia*, Appellant's statement to the Carabinieri on 11 April 2017, as well as any derivative evidence seized pursuant to search authorizations that relied in part on Appellant's 11 April 2017 statement as a basis for probable cause.[7] The Defense contended, *inter alia*, that the protections of Article 31, UCMJ, and the Fifth and Sixth Amendments applied to the Carabinieri's attempts to interrogate Appellant

---

[7] The Defense also moved to suppress the evidence the Carabinieri seized from Appellant's room on 11 April 2017, as well as incriminating statements Appellant made to his first sergeant after he was released from Italian custody. The military judge denied those motions, but those rulings are not at issue on appeal.

because the Italian investigation was a "mere instrumentality" of the AFOSI investigation, and even if these protections did not apply, Appellant's 11 April 2017 statement was the product of coercion. The Government opposed the motion.

The military judge conducted a lengthy motion hearing at the outset of Appellant's trial where he received extensive written filings and heard the testimony of eight witnesses—including Appellant, who testified for limited purposes of the motion hearing. The military judge then issued an oral and written ruling that largely denied the suppression motion. Specifically, the military judge ruled, *inter alia*, Appellant's 11 April 2017 statement was admissible, as were the knife and DNA samples AFOSI obtained through search authorizations.[8] The military judge's written ruling recounted his findings of fact, recited applicable law, and explained his reasoning as follows.

First, the military judge found the "initial arrangement" of the Carabinieri conducting the lead investigation until the United States asserted jurisdiction on 13 April 2017 to be appropriate. He explained:

> The NATO SOFA authorizes the sending State (the United States) and the receiving State (Italy) concurrent jurisdiction for criminal offenses committed by U.S. Armed Forces personnel who have committed an offense in Italy, as long as that offense is a crime under both United States and Italian [law]. . . . When the right to exercise jurisdiction is concurrent, the U.S. has the primary right to exercise jurisdiction in cases involving offenses solely between members of the U.S. Armed Forces.

> Article VII, paragraph 6(a) of the NATO SOFA states that the receiving and sending States "shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offence." They shall also "assist each other in the arrest of members."

> . . . .

> Undoubtedly, the assault alleged on A1C [AS] is one that would violate both Italian and U.S. law. Each state, therefore, would be entitled to investigate the alleged offenses. As a practical matter, in this case the Italian Carabinieri were the lead agency

---

[8] The military judge did suppress a shirt the AFOSI seized during a much later search of Appellant's room because the search was conducted over six months after the authorization expired.

investigating the allegation, and were assisted by U.S. authorities. This is consistent with the SOFA provisions and its [sic] application.

Jurisdiction under the SOFA is a give-and-take process between the States, with formal mechanisms in place for the assertion of jurisdiction. This Court finds the initial arrangement of Italian Carabinieri leading the investigation, assisted by [AFOSI] agents and [security forces] personnel, to be a proper exercise of the concurrent jurisdiction under the SOFA.

Second, the military judge noted that under Military Rule of Evidence (Mil. R. Evid.) 305(f)(2), "foreign law enforcement agents are not required to provide warnings under Article 31 or the Sixth [sic] Amendment." He explained that the rule provides that statements to such agents are admissible unless they are the product of "coercion, unlawful influence, or unlawful inducement." The military judge applied this standard to the circumstances of Appellant's case. On one hand, he noted "[Appellant] was 18 years old; he had never traveled outside of the United States before; he did not have a previous history with law enforcement; he did not speak Italian; he repeatedly requested the assistance of an attorney; [and] he was not offered food or water." On the other hand, the military judge noted:

[Appellant] was eventually provided access to an Italian attorney, Mr. [LR]; he was not physically harmed or threatened; there were other U.S. personnel nearby during his holding at the Aviano Carabinieri station; he was generally aware of some of the evidence the Carabinieri had in this case; and based on what he'd been told by the Carabinieri and Mr. [LR], [Appellant] decided to make a statement. Based on the totality of the circumstances, this Court finds that while the statements made by [Appellant] may have come in an environment including pressure to make a statement by the Carabinieri, this pressure was not sufficient to overbear his capacity for self-determination. His statement was made with a basic understanding of the evidence against him, after receiving advice from Mr. [LR], and in consideration of his circumstances. . . . [H]is statement was given voluntarily and is therefore admissible.

Third, the military judge found the AFOSI's search of Appellant's room on 14 April 2017 resulting in the seizure of the knife, as well as the seizure of Appellant's DNA sample, were lawful. The military judge found that with or without information from Appellant's 11 April 2017 statement, the search authorization was supported by sufficient probable cause through other information presented to the magistrate, specifically the security video and

A1C AS's identification of Appellant. Accordingly, the military judge found this derivative evidence was also admissible.

At trial, the Government did not introduce Appellant's 11 April 2017 statement to the Carabinieri. Trial counsel did introduce the knife the AFOSI found in Appellant's room, as well as evidence derived from Appellant's DNA sample.

## II. DISCUSSION

### A. Denial of the Motion to Suppress

On appeal, Appellant contends the military judge abused his discretion when he failed to suppress Appellant's 11 April 2017 statement to the Carabinieri, as well as any evidence the AFOSI derived from that statement, because the statement was obtained in violation of Appellant's rights under Article 31, UCMJ, and the Fifth Amendment.

#### 1. Law

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffman*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). A military judge abuses his discretion when: (1) his findings of fact are clearly erroneous; (2) he applies incorrect legal principles; or (3) his "application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (quotation omitted).

Servicemembers are generally entitled to the protections of the Fifth Amendment. *United States v. Tempia*, 37 C.M.R. 249, 253–55 (C.M.A. 1967). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. As "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators . . . the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966). Once a suspect in custody has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication . . . ." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *see* Mil. R. Evid. 305(e)(3).

"The protections afforded to servicemembers under Article 31(b), UCMJ, are in many respects broader than the rights afforded to those servicemembers under the Fifth Amendment to the Constitution." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016). Article 31(b), UCMJ, 10 U.S.C. § 831(b), provides:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (footnotes omitted) (citation omitted). An "interrogation" includes "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." Mil. R. Evid. 305(b)(2).

"No statement obtained from any person in violation of [Article 31, UCMJ], or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." Article 31(d), UCMJ, 10 U.S.C. § 831(d).

However, Mil. R. Evid. 305(f)(2) governs interrogations of servicemembers by foreign authorities:

> Warnings under Article 31 and the Fifth and Sixth Amendments to the United States Constitution are not required during an interrogation conducted outside of . . . United States [territory] by officials of a foreign government or their agents unless such interrogation is conducted, instigated, or participated in by military personnel or their agents or by [ ] officials or agents [of the United States or its political subdivisions]. A statement obtained from a foreign interrogation is admissible unless the statement is obtained through the use of coercion, unlawful influence, or unlawful inducement. An interrogation is not "participated in" by military personnel or their agents or by the officials or agents [of the United States or its political subdivisions] merely because such a person was present at an interrogation conducted in a foreign nation by officials of a foreign government or their

10

agents, or because such a person acted as an interpreter or took steps to mitigate damage to property or physical harm during the foreign interrogation.

*See generally United States v. French*, 38 M.J. 420 (C.M.A. 1993) (explaining circumstances under which U.S. military involvement in foreign law enforcement interrogation of U.S. servicemember implicates Article 31, UCMJ, and constitutional rights).

"Voluntariness of a confession is a question of law that an appellate court independently reviews, *de novo*." *United States v. Bubonics*, 45 M.J. 93, 94 (C.A.A.F. 1996) (citations omitted). With limited exceptions, an involuntary statement of an accused and any evidence derived therefrom is inadmissible at trial, provided the defense makes a timely motion or objection. Mil. R. Evid. 304(a). A statement is "involuntary" if it is "obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid. 304(a)(1)(A). If the accused's "will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process." *Bubonics*, 45 M.J. at 95 (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). The burden is on the Government to prove by a preponderance of the evidence, under the totality of the circumstances, that the confession was voluntary. *Id.* (citations omitted).

Evidence unlawfully obtained by the Government is not necessarily inadmissible. "Evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made." Mil. R. Evid. 311(c)(2). As the United States Court of Appeals for the Armed Forces has explained:

> The doctrine of inevitable discovery allows for the admission of illegally obtained evidence when the government "demonstrate[s] by a preponderance of the evidence that when the alleged illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence in a lawful manner."

*United States v. Eppes*, 77 M.J. 339, 347 (C.A.A.F. 2018) (alteration in the original) (quoting *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014)).

Where an error is of constitutional dimensions, an appellate court must conclude the error was harmless beyond a reasonable doubt in order to affirm the result. *United States v. Condon*, 77 M.J. 244, 246 (C.A.A.F. 2018) (citing *United States v. Jerkins*, 77 M.J. 225, 228 (C.A.A.F. 2018)). An error is harmless beyond a reasonable doubt when it "did not contribute to the verdict." *Id.* (citing *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018)).

**2. Analysis**

The first step in our analysis is to determine whether Appellant was entitled to the protections of the Fifth Amendment and Article 31, UCMJ, when the Carabinieri interrogated him. If not, the next step is to determine whether his 11 April 2017 statement was otherwise "involuntary"—that is, the product of coercion, unlawful influence, or unlawful inducement. *See* Mil. R. Evid. 304(a)(1)(A); Mil. R. Evid. 305(f)(2). If Appellant's statement was unlawfully obtained, we next consider whether evidence derived from it was nevertheless admissible under the inevitable discovery doctrine. Finally we consider, if the evidence was inadmissible, whether the error was nevertheless harmless to the result of Appellant's trial beyond a reasonable doubt.

### a. Was Appellant's Statement Lawfully Obtained?

Consistent with our superior court's analysis in *French*, we first consider whether the Italian and United States investigations were "so intertwined" that Appellant's interrogation by the Carabinieri was effectively part of AFOSI's investigation, such that rights warnings were required. 38 M.J. at 426. We find that the two investigations were not so merged. Carabinieri investigators arrived at the crime scene within two minutes of the first AFOSI agent to arrive, SA JW. Shortly thereafter, the Carabinieri asserted jurisdiction over the investigation in emphatic fashion, threatening to arrest SA JW if they were not allowed access to the crime scene. The Carabinieri then began searching the scene and actively investigated the crime while AFOSI and security forces conducted a parallel investigation, separate from the Italians.

As the military judge found, this was consistent with both the SOFA and standard operating procedures between the Italian and U.S. Air Force authorities. The SOFA clearly afforded Italy jurisdiction over this crime. Later, when the suspect was identified as a U.S. servicemember, it became clear the United States also had jurisdiction, but until that point it was both lawful and logical for the Carabinieri to initiate the primary investigation.

It is true that under the SOFA, because the suspect and the victim were both U.S. servicemembers, the United States had the *primary* right to exercise jurisdiction. Furthermore, according to Dr. SP, the United States routinely exercised its primary right of jurisdiction in such situations. However, as the military judge found, and consistent with Dr. SP's testimony, the United States' assertion of jurisdiction was a formal process between the two states. Until the United States formally asserted jurisdiction, Italian authorities had both full authority and, no doubt, a responsibility to investigate the crime. Moreover, the record indicates the Carabinieri did vigorously investigate it on their own authority and not merely at the instigation or inveiglement of U.S. authorities.

Furthermore, the support that U.S. authorities provided to the Carabinieri on 11 April 2017 was not so extensive as to transform the Italian investigation into a "merged" or "intertwined" one. As the military judge noted, the SOFA required the United States to "assist" Italy in its investigation, to include "the arrest of [service]members." Therefore, the fact that security forces apprehended Appellant and turned him over to the Carabinieri creates no inference that the Carabinieri were not conducting an Italian investigation. The AFOSI agents' use of a "black light" to help the Carabinieri look for body fluids on Appellant's jacket was perhaps a more active step, but we find this limited involvement in a supporting role did not "merge" the two investigations. It is instructive to compare Appellant's case to *French* in this regard. There, as here, U.S. Air Force law enforcement provided resources to search the appellant's residence for evidence—in that case, by having "an Air Force drug dog and handler walk[ ] through the [appellant's] residence at the request of the British police." *French*, 38 M.J. at 423. Despite this and other minor participation by U.S. personnel in the investigation, the United States Court of Military Appeals found no merger of British and United States investigations. *Id*. at 426. Similarly, we conclude that—up to the point at which Appellant provided his statement on 11 April 2017—he had been held and questioned pursuant to a solely Italian investigation.

However, Appellant would nevertheless be entitled to Fifth Amendment and Article 31, UCMJ, rights warnings if the interrogation itself was "participated in by [U.S.] military personnel or their agents." Mil. R. Evid. 305(f)(2); *see French*, 38 M.J. at 426. The military judge made the following pertinent findings of fact, which we do not find to be clearly erroneous:

> [Appellant] was taken into an interview room, along with Mr. [LR]. Also in the room were a Carabinieri officer typing his statement, Mr. [GZ], a[ ] [U.S. Air Force security forces] interpreter, a Carabinieri officer in plain clothes with a goatee, and one other Carabinieri officer standing behind [Appellant].

> [Appellant] does not speak Italian. *The questions were posed to him by Mr. [GZ].* There were sometimes exchanges between the typist and Mr. [GZ] on what to ask [Appellant]. The interrogation lasted several hours.

> After his questioning, [Appellant] was presented with a document in Italian that purported to contain his statement. [Appellant] does not believe he was presented with a translation in English, nor that it was translated to him orally. He was instructed to sign the statement, which he did. It was also signed by Mr. [LR] and Mr. [GZ].

(Emphasis added.) These findings of fact certainly appear to raise a very real possibility that an "agent" of the United States military "participated" in Appellant's interrogation. Although "merely . . . act[ing] as an interpreter" is not "participation" for purposes of Mil. R. Evid. 305(f)(2), the military judge's findings suggest more than mere interpretation. According to the military judge, Mr. GZ asked the questions, and only "sometimes" did he consult with the Carabinieri as to what to ask over the course of "several hours." Furthermore, Mr. GZ was an "agent" of the United States military in the sense that, in his own words, he had "work[ed] for Security Forces" at Aviano AB since 2003.

The military judge appears not to have fully appreciated the significance of his findings. After he found the Carabinieri were properly exercising jurisdiction over the investigation on 11 April 2017, the military judge moved directly to an analysis of whether Appellant's statements were the product of coercion, unlawful influence, or unlawful inducement, without analyzing Mr. GZ's role in the interrogation itself. It is possible the military judge believed Mr. GZ was not acting as an "agent" of the United States military on that particular occasion, in his role as an interpreter for the Carabinieri, despite his employment by security forces. Alternatively, it may be the military judge believed Mr. GZ was functioning solely as an interpreter and did not intend for his findings of fact to convey otherwise. It is possible the military judge simply overlooked this step in his analysis. In any event, at a minimum the military judge's findings of fact, which we are bound to accept unless clearly erroneous, raise a substantial question as to whether an "agent" of the United States military "participated" in Appellant's interrogation. Accordingly, rather than further parse the meanings of "agent" and "participate" in these circumstances, we assume *arguendo* Appellant was entitled to the protections of Article 31, UCMJ, and the Fifth Amendment during his custodial interrogation on 11 April 2017, rights which were plainly not afforded to him. Therefore, for purposes of our analysis, we assume Appellant's statement was unlawfully obtained.

As a result, we need not separately consider the military judge's conclusion that Appellant's statement was voluntary before we address whether the derivative evidence was admissible. However, one further point bears comment. Although Appellant has not raised on appeal the issue of ineffective assistance of counsel, we have considered the performance of Mr. LR, who testified in the course of the motion hearing with respect to his role in the creation of Appellant's statement. Mr. LR's approach to advising Appellant might strike many attorneys who practice in the military justice system as reckless. Despite never having met Appellant before, having no prior knowledge of his case, having reviewed no actual evidence, and being in his own words "100 percent" certain Appellant would ultimately be tried by the United States military rather than

in Italian court,[9] on the basis of a two or three minute conversation with the Carabinieri, Mr. LR advised Appellant—after a 10-minute consultation—to provide a highly-incriminating statement. However, even if we assume without deciding that our ineffective assistance of counsel jurisprudence applied to Mr. LR and that his performance was deficient in some respect, for the reasons explained below it is clear any deficiency had no effect on the outcome of the Appellant's court-martial. *See United States v. Green*, 68 M.J. 360, 361–62 (C.A.A.F. 2010) (citations omitted).

### b. Was the Derivative Evidence Admissible?

Perhaps presciently, in light of our analysis above, trial counsel elected not to introduce Appellant's 11 April 2017 statement at trial. However, the Government did introduce two notable items of evidence that were derived in part from that statement, specifically the knife AFOSI seized from Appellant's room on 14 April 2017 and Appellant's DNA samples. The AFOSI obtained both items pursuant to a search authorization that relied in part on information from Appellant's statement. Therefore, the next question we must answer is whether this evidence was admissible even if the statement was unlawfully obtained. We conclude that it was, based on the doctrine of inevitable discovery. *See* Mil. R. Evid. 311(c)(2).

The military judge did not reach this issue; therefore, we review de novo whether a preponderance of evidence demonstrates that "'when the alleged illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence' in a lawful manner." *Wicks*, 73 M.J. at 103 (quoting *United States v. Dease*, 71 M.J. 116, 122 (C.A.A.F. 2012)). They did possess such information. Even without Appellant's statement to the Carabinieri, the AFOSI possessed strong evidence indicating Appellant perpetrated the assault on A1C AS. Specifically, A1C AS's description of the assault coupled with the security camera video and the positive identification of Appellant by members of his unit provided more than adequate probable cause to support search authorizations for Appellant's dorm room and DNA samples. Moreover, we find the AFOSI inevitably would have sought such authorizations and conducted these searches and seizures after United States asserted primary jurisdiction on 13 April 2017.

Appellant contends the Carabinieri's failure to discover the knife during their search on 11 April 2017 indicates its discovery was not "inevitable." We

---

[9] Mr. LR testified that, at the time, he was also "99 percent" sure he would not continue as Appellant's attorney after the night of 11 April 2017. Mr. LR was correct; his only further participation in the case was as a witness.

are not persuaded. Whatever searching protocols or techniques the Carabinieri employed, we have no reason to doubt the AFOSI would have found the knife in the shoe box when they inevitably conducted their own search of the room, as they in fact did find it on 14 April 2017. We have considered whether the content of Appellant's statement to the Carabinieri may have assisted the AFOSI in locating the knife, and we conclude it did not. The statement makes no reference to wrapping the knife in a paper towel or hiding it in a shoe box or anywhere else. Essentially, Appellant's statement indicated that when he went to his room after the assault he thought he still had the knife in his hand, but he did not "remember precisely;" it was also possible he left the knife on the ground somewhere "between the two dormitories." This was hardly more information than the AFOSI already possessed from the security video. We find no basis to conclude the statement materially assisted the AFOSI in locating the knife.

Accordingly, both the knife and the DNA analysis derived from Appellant's DNA sample were admissible, even if Appellant's statement was unlawfully obtained.

### c. Was Any Error Harmless Beyond a Reasonable Doubt?

Furthermore, even if the knife and analysis of Appellant's DNA sample were not admissible at trial, we find any erroneous admission was harmless beyond a reasonable doubt.[10] Even without these links, the evidence identifying Appellant as A1C AS's assailant was overwhelming. Among other evidence, at trial A1C AS positively identified Appellant as her attacker; the security video depicted Appellant moving around the dormitory, including going into A1C AS's quad at the time of the assault; members of Appellant's unit identified him in the video; and forensic analysis of bloodstains on Appellant's clothing matched A1C AS's DNA. Furthermore, A1C AS described being stabbed by Appellant, and testified that although she did not see the knife, she felt it. Additionally, the Government called Dr. RC, a forensic pathologist, as an expert witness who testified that he "knew it was a serrated knife as soon as [he] saw the injuries [to A1C AS]." The most contentious issues at trial were not whether Appellant stabbed A1C AS or whether he used a knife to do it, but rather Appellant's intent at critical points in time, which brings us to the second issue Appellant raises on appeal.

---

[10] Because we conclude the derivative evidence would have been inevitably discovered without Appellant's statement and, even if erroneously admitted, did not contribute to the verdict, we need not and do not address whether the evidence was also admissible under Mil. R. Evid. 311(c)(3) (good faith exception) or Mil. R. Evid. 311(a)(3) (appreciable deterrence).

**B. Legal and Factual Sufficiency of the Attempted Murder Conviction**

**1. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

As charged in Appellant's case, the elements of Specification 1 of Charge I alleging attempted murder of A1C AS in violation of Article 80, UCMJ, 10 U.S.C. § 880, included the following: (1) that Appellant did a certain overt act—in this case, that Appellant stabbed A1C AS with a knife; (2) that the act was done with the specific intent to commit a certain offense—in this case, the murder of A1C AS; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 4.b.; *United States v. Payne*, 73 M.J. 19, 24 (C.A.A.F. 2014).

The elements of unpremeditated murder with an intent to kill in violation of Article 118, UCMJ, 10 U.S.C. § 918(2), include: (1) that a certain person is dead; (2) that the death resulted from the act of the accused; (3) that the killing was unlawful; and (4) that, at the time of the killing, the accused had the intent to kill. *MCM*, pt. IV, ¶ 43.b.(2).

**2. Analysis**

Appellant contends his conviction for attempted murder is legally and factually insufficient specifically with regard to evidence that he intended to kill A1C AS. Appellant offers several arguments that we consider in turn.

Appellant refers us to his 11 April 2017 statement to the Carabinieri, noting that therein he does not describe any intent or plan to kill A1C AS or anyone else. However, as the Government correctly notes, that statement was not admitted at trial, and therefore is not part of our assessment of the sufficiency of the evidence that was admitted. *See Dykes*, 38 M.J. at 272.

Appellant characterizes his behavior during the early morning of 11 April 2017 as "strange," "random," "unscripted," and perhaps influenced by alcohol. He suggests that the oddity of his behavior indicates the lack of any fixed intent to commit a murder. However, some evidence suggests Appellant's behavior may not have been as "random" as he now portrays, and that he may have been looking for a particular individual. A1C JS, the friend with whom Appellant had spent the preceding evening, testified that Appellant had told her about a female Airman he had met recently that he was "interested in or pursuing." Appellant told A1C JS he had "tried to kiss her" but "it didn't end well," and Appellant "seemed a little upset or embarrassed about it." The female Airman in question, A1C JL, also testified, and described rejecting Appellant when he tried to kiss her in her dorm room. Perhaps not coincidentally, A1C JL lived in the same dormitory where Appellant was peering in windows and exploring unlocked doors on the morning of 11 April 2017. It is also perhaps not a coincidence that Appellant called A1C JL six times that morning while A1C JL was asleep. In any event, it is admittedly not clear why exactly Appellant decided to attack A1C AS. However, the essential question is not why he selected A1C AS, but whether he intended to kill her when he stabbed her with the knife.

Appellant suggests the "superficial," non-life-threatening nature of A1C AS's wounds indicate he lacked the intent to kill. However, Dr. RC, the forensic pathologist, testified that three of the stab wounds, including the initial one on the back of the scalp, were "in the region of the head and neck, and just above particularly vital structures and areas that would be susceptible to rapid fatality if injured by a sharp force," and he agreed that even a superficial injury in that area could be "lethal in short order" if it hit certain points. "[T]he Government [is] free to prove Appellant's intent by circumstantial evidence." *United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). In this case, the circumstantial evidence of Appellant's intent is that Appellant stabbed a sleeping woman in the head, very close to a vital area likely to inflict a fatal wound, and continued striking at her head with a series of rapid knife blows as she rose and attempted to shield herself. That he failed to kill A1C AS due to nervousness, inexperience, or some other factor, and then broke off the attack and fled when

she screamed, does not indicate a lack of intent to kill when he stabbed her. Appellant did not know A1C AS, and he said nothing to her during the assault; his potentially fatal blows had no evident purpose other than an attempt to kill.

The military judge heard the testimony and observed the witnesses testify. The military judge was persuaded the Government proved every element of attempted murder beyond a reasonable doubt, including the intent to kill. So are we. Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction beyond a reasonable doubt. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for attempted murder in violation of Article 80, UCMJ, is therefore both legally and factually sufficient.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

MAYBERRY, Chief Judge (concurring in part and in the result):

I agree with my esteemed colleagues that the knife and the DNA analysis derived from Appellant's DNA sample were admissible under the inevitable discovery exception to the exclusionary rule, and if they were not, any erroneous admission was harmless beyond a reasonable doubt. Unlike my colleagues, I find the military judge erred in finding that the investigations involving the Carabinieri and the agents of the United States military were independent and that no agent of the United States participated in Appellant's interrogation.[1] Appellant was entitled to the protections of Article 31, UCMJ, 10 U.S.C. § 831, and the Fifth Amendment[2] during his custodial interrogation on 11 April 2017. The majority concludes that "up to the point at which Appellant provided his

---

[1] The majority states that the military judge's findings of fact raise a substantial question as to whether an "agent" of the United States military "participated" in Appellant's interrogation and assume *arguendo* Appellant's statement was unlawfully obtained.

[2] U.S. CONST. amend. V.

statement on 11 April 2017—he had been held and questioned pursuant to a solely Italian investigation." I disagree.

The facts before us are clear in the overall timeline of events. Air Force Security Forces and Air Force Office of Special Investigation (AFOSI) personnel were at the crime scene shortly before 0500 on 11 April 2017. The Carabinieri arrived shortly thereafter from their on-base station house, demanded access to the crime scene, and took the lead in the investigation. Within six hours, Appellant had been identified as the primary suspect based on United States military law enforcement efforts, which was shared with the Carabinieri. In less than an hour, Appellant was apprehended by United States military personnel on base, in the vicinity of Carabinieri forces, and turned over to the Carabinieri. For approximately the next eight hours, United States agents were involved and present at virtually every stage of the investigative efforts, to include the search of Appellant's dorm room, interview of the victim, and Appellant's interrogation. There was never an independent investigation to merge—all of the investigative activities involved members of both nations' law enforcement.

This case is distinguishable from *United States v. French*, 38 M.J. 420 (C.M.A. 1993), in significant ways. First, the British authorities advised Airman First Class French that he had a right to remain silent and that anything he said could be used in evidence against him. *Id.* at 421. While this iteration did not meet the Article 31(b), UCMJ, 10 U.S.C. § 831(b), standards, Appellant was not provided any rights advisement. Second, the investigation in Appellant's case was jointly initiated by the United States and Italy from the outset, whereas in *French*, it was "unquestionably a British investigation and not a 'joint operation.'" *Id.* at 424. Specifically, with regards to the interrogation of Appellant at the Aviano City Caribinieri station, Mr. GZ, an Italian employee of the United States security forces, was the only law enforcement member to speak directly with Appellant. He was not "merely present"; he alone questioned Appellant and communicated to the Caribinieri "recorder" in a language Appellant did not speak or understand. For these same reasons, Mr. GZ was also not a "mere interpreter" pursuant to Mil. R. Evid. 305(f)(2).

Once Appellant was identified as a service member of the United States, the primary right to exercise jurisdiction belonged to the United States. Appellant's Italian appointed lawyer knew that within moments after arriving at the Carabinieri station, informing Appellant that "99 percent [of] my job for you would finish this evening, because I am sure that the U.S. government would obtain jurisdiction."

In light of the facts and circumstances, the military judge erred in finding this was not a joint investigation requiring that Appellant be advised of his rights under Article 31, UCMJ, and the Fifth Amendment. Nevertheless, the

knife and derivative DNA evidence were admissible under the inevitable discovery exception.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court